IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**SPRP, LLC**  **PLAINTIFF**

VS.  **CASE NO.: 3:24-CV-051-MPM-RP**

**JAY WOLFF, BRANDON SOJKA,**
**DYNAMIC NEUTRACEUTICALS, LLC,**
**and JOHN DOES 1-4**  **DEFENDANTS**

**ORDER**

This cause comes before the court on the motion of defendants Jay Wolff, Brandon Sojka and Dynamic Neutraceuticals, LLC, ("Dynamic") pursuant to Fed. R. Civ. P. 12(b)(2), to dismiss this action for lack of personal jurisdiction over them. Plaintiff SPRP, LLC has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is, *inter alia*, a fraud action arising out of a business relationship gone sour. Plaintiff SPRP, LLC, a Mississippi company, developed a nutritional supplement called SmartPrime, and it sought a manufacturer to make the product. Following negotiations among the parties, plaintiff reached an agreement with defendant Dynamic, a supplement manufacturer with a factory located in North Carolina, to produce SmartPrime. In the course of the negotiations among them, Dynamic notified plaintiff, in an email sent by its VP of sales Sojka, that it wished to manufacture the product under a different name – NutraShure – for various business and legal reasons. [Exhibit D at 1]. Sojka's email made clear, however, that "[w]e accept full responsibility to [sic] the manufacturing quality and such," and plaintiff contends that he was thus led to believe that, brand names notwithstanding, Dynamic would be manufacturing the product at its state-of-the-art North Carolina factory. *Id.*

1

Plaintiff contends that, instead of this occurring, defendants actually performed a "bait-and-switch," whereby the rights and obligations under the SmartPrime contract were secretly given to Sojka. Plaintiff alleges that, as part of a secret understanding among defendants, Sojka left Dynamic and ended up making SmartPrime himself at a facility located in his home state of New York. [Brief at 7]. Specifically, plaintiff writes that:

> Instead of Wolff managing the Contract and Dynamic manufacturing the product as promised, Wolff and Dynamic walked away from the Contract without notifying SPRP of their change of mind. At the same time, Sojka's role as Dynamic's VP of Sales was terminated, and, again, SPRP was not notified. Dynamic, Wolff and Sojka executed a bait-and-switch, a secret agreement that Sojka would leave Dynamic with the SPRP contract in his hands to do what he pleased with it. Dynamic, Wolff and Sojka allowed for Sojka to create a secret company with the same name as the "front" or "shell" company that Wolff and Dynamic promised to form. The defendants never told their secrets to SPRP and concealed the truth from SPRP.
> Sojka'a secretly-formed, fraudulently-named company received the benefit of the terms SPRP agreed to with Wolff and Dynamic. However, without experienced management and certified manufacturing capabilities, SPRP did not get the benefit of its bargain. The defendants are now liable for the scheme they executed and for their secrets, their concealment of the truth, their misrepresentations and their fraud.

[Brief at 1-2]

In its brief, plaintiff insists that it was unaware that its product was being made by Sojka in New York until it received notice of a lawsuit filed against it by a New York company called NutraShure Distribution, LLC. Specifically, plaintiff argues that:

> When Sojka became unaffiliated with Wolff, Dynamic and Wolff were under a contractual duty to tell SPRP of that separation and also that a Dynamic-unaffiliated "NutraShure" company would be created and inserted into the arrangement. (*Id*.). Neither Dynamic nor Wolff ever notified SPRP that Sojka or NutraShure were no longer affiliated with Dynamic. (Exh. 4). In reliance on the NDA, SPRP believed everyone was and remained affiliated with Dynamic. SPRP did not even know that a New York company named NutraShure even existed until that company sued SPRP. (*Id*.).

[Brief at 7]. In the New York action, NutraShure alleges that SPRP provided it with false representations regarding the alleged health benefits of SmartPrime and that it incurred considerable losses in making a product which, it found, did not work as advertised. [New York

2

complaint at 4]. For its part, however, plaintiff contends that the New York action simply represents a preemptive attempt by defendant to have the issues in this case litigated in a more convenient local forum.

With these facts and procedural history in mind, this court will proceed to an evaluation of the jurisdictional issues in this case. It is well-settled that the party who attempts to invoke the jurisdiction of the Court bears the burden of establishing a *prima facie* case of personal jurisdiction over each defendant. *D.J. Investments, Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.,* 754 F.2d 542, 545 (5th Cir. 1985); *Lofton v. Turbine Design, Inc.,* 100 F. Supp. 2d 404, 407 (N.D. Miss. 2000). Personal jurisdiction over a defendant can be exercised to the same extent that a state court in this forum could. The reach of such jurisdiction is limited by the state's applicable long-arm statute as well as the due process requirements of the Fourteenth Amendment. *Tellus Operating Group, LLC v. R & D Pipe Company,* 377 F. Supp. 2d 604, 606 (S.D. Miss. 2005) (internal citation omitted). Under these due process requirements, the contacts with the forum state "must be such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). The plaintiff must show that defendant "purposefully avail[ed] [themselves] of the privilege of conducting activities within [Mississippi], thus invoking the benefits and protections of its laws." *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 109 (1987) (citation omitted).

In order for a Mississippi court to exercise personal jurisdiction over a non-resident defendant, the plaintiff must first demonstrate that the defendant falls within one of the three prongs of the Mississippi long-arm statute. *Yatham v. Young,* 912 So. 2d 467 (Miss. 2005). These include the "doing business," "contract," and "tort" prongs of the state's long-arm statute. Miss.

Code Ann. § 13-3-57 (2007).  After the plaintiff makes this initial showing, he must then demonstrate that an exercise of personal jurisdiction would be permissible under the Fourteenth Amendment of the United States Constitution.  *Allred v. Moore & Peterson,* 117 F.3d 278, 281 (5th Cir. 1997), cert. denied, 522 U.S. 1048 (1998).  Mississippi's Long-Arm Statute is not coextensive with federal due process, and an analysis of the scope of the statute is thus required when a defendant challenges the court's exercise of personal jurisdiction. *Allred,* 177 F.3d at 282.

> In their brief, defendants frame the jurisdictional issues as follows:
>
> Wolff is not a Mississippi citizen or resident, nor has he been served with process here. He is, as the Complaint alleges, a citizen and resident of the State of North Carolina (Doc #55, at ¶ 2). He, together with Andrew Ward, also a citizen and resident of the State of North Carolina, are the sole members of Dynamic (Exhibit G, at ¶ 3). Thus, absent affirmative consent, jurisdiction over these parties may only be predicated, if at all, on the Mississippi Long Arm Statute, *Miss. Code Ann.* § 13-3-57, and even then only if the exercise of such jurisdiction comports with constitutional considerations of due process, that is, only to the extent the action "...arises out of the [defendant's] contacts with the forum state *and* the nature, quality and extent of those contacts renders the exercise of personal jurisdiction consistent with due process notions of 'fair play and substantial justice.'" *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 *U.S.* 915, 919 (2011); *International Shoe Co. v. Washington,* 326 *U.S.* 310, 316 (1945); *Allred v. Moore & Peterson, supra; Johnson v. TheHuffingtonPost.com, Inc.,* 21 *F.4th* 314 (5th Cir. 2023).

[Brief at 14-15].

This court agrees with defendants' description of the jurisdictional burden facing plaintiff, and it further tends to agree that none of the defendants have expressly consented to being sued in Mississippi.  In so concluding, this court tends to agree with defendants, and with Judge Percy's conclusion in a May 24, 2024 order, that a preliminary non-disclosure agreement ("NDA") entered into among the parties had expired by its own terms before the dispute in this case arose.  In the NDA, defendants did, in fact, agree to litigate any disputes among them arising from the agreement in Mississippi, but this agreement had a limited duration which had expired and therefore does not appear to constitute a valid basis for finding consent to personal

4

jurisdiction in Mississippi. Plaintiff strenuously argues otherwise in its briefing, and it does at least seem arguable that, in light of the corporate shell games which were allegedly played by defendants, the NDA should be deemed to have been violated during its term. Plaintiff argues, for example, that:

> Sojka … used confidential information to decide to go solo, leave Dynamic and complete the bait-and-switch. He was bound to any use of information to evaluate the Dynamic/SPRP deal. The NDA prohibited the use of SmartPrime/SPRP information and information regarding the business deal for any purpose "other than for evaluating this matter." [62-9, ¶2]. The defendants breached this duty before and after the contract was signed. The defendants use confidential information in the termination agreement with Sojka is all but admitted by defendants.

[Brief at 18].

This court regards these as good-faith arguments for the applicability of the NDA (and its consent to jurisdiction) in this case, and it at least seems possible that they could carry the day on their merits. As it happens, however, this court concludes that there is a clearer basis for finding personal jurisdiction over defendants in this case, namely the tort prong of Mississippi's long-arm statute. As noted previously, plaintiff contends that, in an email sent to its Mississippi headquarters, defendants fraudulently misrepresented that SmartPrime would be manufactured by Dynamic in its factory in North Carolina. [Brief at 1]. This court concludes that, by sending this email to plaintiff in Mississippi, defendants allegedly committed an act of fraud which took place, in part, in this state. This is significant, since § 13-3-57 provides that "[a]ny nonresident person, firm, general or limited partnership . . .who shall commit a tort **in whole or in part in this state against a resident or nonresident of this state**, or who shall do any business or perform any character of work or service in this state, shall by such act or acts be deemed to be doing business in Mississippi and shall thereby be subjected to the jurisdiction of the courts of this state."

5

This court has reviewed the email in question, and it appears to fully support plaintiff's allegations in this case. Defendants have attached a copy of the email as an exhibit to their motion, and it reads as follows:

> Hi David and team,
> Happy Monday!
> Attached are the tracked changes from our attorney. Nothing crazy, just changing the entity from Dynamic to a new entity name. Because we will be selling this ingredient to our competitors, we'd like to not have Dynamic referenced. This ensures other co-mans will still be apt to use the ingredient without the concern that we'd take their manufacturing business.
> Also, from an indemnification/liability standpoint, we do not want to be held responsible in the event a brand/client seeks legal action for the products claims, marketing, etc. **We fully accept responsibility to [sic.] the manufacturing quality and such**, but since the IP falls within NPI,[1] we'd need to be indemnified from legal actions that result from the claims coming from NPI's end. Let me know if you'd like to jump on a call to discuss.
> Thank you,
> Brandon Sojka, CSCS, CISSN, Pn1/ **Vice President of Sales**
> **Dynamic Nutraceuticals**

[Exhibit D at 1] (emphasis added). In its brief, plaintiff notes that "Dynamic's contract emails were received from and sent to SPRP member and 1099 worker David Dixon, a Mississippi resident, making contract negotiations and the related representations aimed directly at both a Mississippi entity, SPRP, but also directly to a Mississippi resident." [Brief at 5, n 4].

Sojka wrote to plaintiff in his capacity as "Vice President of Sales" of "Dynamic Nutraceuticals" and he specifically represented that "[w]e fully accept responsibility to [sic.] the manufacturing quality and such." In the court's view, any reasonable person reading these words would conclude that Sojka was assuring plaintiff that Dynamic would be manufacturing SmartPrime. This assurance strikes this court as an unsurprising one, since plaintiff sought to do business with Dynamic, a supplement manufacturer, and, under these circumstances, any

---

[1] This court notes that NPI was plaintiff's previous name.

6

reasonable person would assume that this manufacturer would, in fact, be making the product. Moreover, the scenario which actually took place in this case, namely a sales VP leaving the company and manufacturing the product himself, strikes this court as a highly unusual one which no reasonable business entity would anticipate occurring. This being the case, this court believes that it was incumbent upon *all* defendants to notify plaintiff that these unusual events were transpiring, in order to obtain its express consent to them. This court frankly doubts that such consent would have been forthcoming, since, as far as it can tell, no owner of a product would like to see it manufactured by a former sales VP of a manufacturer, instead of the manufacturer itself.

In their briefing, defendants attempt to put the best possible face upon Sojka's email, writing that:

> As initially contemplated, the parties' licensing arrangement for SmartPrime was to have been between Plaintiff, on the one hand, and Dynamic, on the other. (Doc #33-12; Exhibit G, at ¶¶ 9-11). Plaintiff negotiated the matter entirely with Sojka. Sojka and Wolff, however, agreed that Dynamic's best interests required that it withdraw from the negotiations in favor of a new entity to be created to undertake performance of the contract then in discussion. (Exhibit G, at ¶ 11). An email from Sojka to Ryan Yates, Plaintiff's Managing Member, dated March 8, 2021 (Exhibit D), just four days before Contract execution – describes the contemplated change and proposes to substitute a new entity for Dynamic. The new entity was NutraShure. Thus, the parties agreed that NutraShure, "a new entity...," would be the party performing the Contract on one side, and that Plaintiff would be the party performing on the other. (Id.) In March, 2021, Plaintiff thus entered into a written agreement ("the Contract") with NutraShure (Exhibit C).

[Brief at 8-9]. Defendants thus assert that they decided that Dynamic's own "best interests required that it withdraw from the negotiations in favor of a new entity to be created to undertake performance of the contract then in discussion," but they do not explain why they decided to keep this rather important piece of information to themselves instead of sharing it with plaintiff.

7

It seems clear that the failure to disclose this crucial information to plaintiff was attributable to *all* defendants in this case, and, that being the case, this court is quite unreceptive to any efforts by Dynamic and Wolff to assign blame in this regard to Sojka alone. This court's reluctance to absolve Dynamic and Wolff of responsibility becomes even greater in light of their attempts to deny that Sojka's email gave the impression which it clearly did. Specifically, defendants write that:

> Plaintiff insists it was "promised" that the newly created entity would be *affiliated* with Dynamic (*see, e.g.,* Doc #55, at ¶ 12). We have no idea what "affiliated" means in this context, and plaintiff offers no explanation of the term. At all rates, the Contract does *not* support plaintiff's claim; it makes no reference to any association whatsoever between Dynamic and NutraShure, merely describing NutraShure as a "contract manufacturer offering services for companies wishing to produce proprietary products for [human] use..." (Exhibit C, at p. 1).

[Brief at 9, footnote 6].

Defendants thus attempt to rely on the language of the contract, as if the specific misrepresentations made by Sojka in his email might not equally give rise to a fraud claim. Clearly, however, they can. This court notes that, even if it were inclined to allow defendants to evade responsibility in this regard based on the language of the contract (which it is not), that contract also offers support for plaintiff's claims in this case. As noted previously, plaintiff was sued in the New York action by a **New York** company called NutraShure Distribution, LLC, and it seems clear that this is the company which had been making his product. It is thus significant that the very first paragraph of the contract upon which defendants rely provides that "NutraShure Distribution, LLC, a **North Carolina** limited liability company" is entering into the contract. Thus, even the contract drafted by defendants includes evidence of the fraud of which, plaintiff claims, it was the victim in this case.

8

This court notes that defendant Wolff signed this contract on behalf of the (apparently stillborn) North Carolina version of NutraShure, and at no point in the contract is there any mention of the New York version of NutraShure, owned by Sojka, to which defendants saw fit to assign manufacturing responsibilities under the contract, without telling plaintiff. This court believes that, Sojka's representations aside, the actions of all three defendants in this case have a rather strong odor of dodginess to them, based on their very nature. Indeed, a scenario whereby a manufacturer decides to have its former sales VP make the product without telling plaintiff about it strikes this court as a highly unusual one which, by its very nature, is suggestive of shady dealings. This appearance of dodginess is only strengthened by Dynamic's decision, based upon advice of counsel, that it was not prepared to go forward with the deal under its own name. This frankly strikes this court as the kind of action which tends to be taken by entities which know they are up to no good and wish to avoid facing legal liability for it.

In light of the foregoing, defendants' insistence that they have no idea why plaintiff might have thought that Dynamic would have any "affiliation" with NutraShure strikes this court as being quite disingenuous, and their attempt to persuade it otherwise merely heightens the impression that all three defendants are deeply involved in the alleged fraud in this case. As quoted above, defendants argue in their brief that:

> Plaintiff insists it was "promised" that the newly created entity would be *affiliated* with Dynamic (*see, e.g.,* Doc #55, at ¶ 12). We have no idea what "affiliated" means in this context, and plaintiff offers no explanation of the term.

*Id*. This "we have no idea what plaintiff is talking about" argument strikes this court as being quite unpersuasive, since SPRP was specifically led to believe that Dynamic would be *manufacturing the product*. If there is any universe in which manufacturing a product is not being "affiliated" with it, then it is not at all apparent to this court.

9

At other points in their briefing, Wolff and Dynamic appear to drop their gaslighting efforts and tacitly acknowledge that Sojka's email constitutes a highly damaging piece of evidence for them. In seeking to distance themselves from that email, defendants write that:

> Wolff further avers that Sojka alone undertook the negotiations and communications with Plaintiff leading to the Contract; that he (Wolff) executed the same because he fully expected and intended, in good faith, to form NutraShure with Sojka as a North Carolina limited liability company, but that he and Sojka parted ways before that could happen, resulting in Sojka's separation from employment as an employee of Dynamic, and his formation of NutraShure in New York. (Id., ¶¶ 9, 10, 11, 14). To the best of Wolff's knowledge, information and belief, Sojka, through NutraShure, undertook performance of the Contract, including the manufacture and sale of Smart Prime, and the electronic transmission of payment on account thereof. Plaintiff concedes as much. (Doc #55, at ¶ 21). Finally, Wolff avers that he has no interest in NutraShure, and no equity position with that enterprise. (Exhibit G, at ¶ 16).

[Brief at 24]. In so arguing, Wolff ignores the fact that he was cc:ed on the email sent by Sojka, and, as such, he was put on notice of the clear impression given by that email, namely that Dynamic would be manufacturing the product. Under these circumstances, Wolff clearly had a duty to correct any erroneous impression given by the email, and any attempt on his part to characterize Sojka as a former employee acting on his own seems less than credible.

In this court's experience, defendants who are guilty of fraud seldom admit to it in their briefing, and it will be for jurors to determine whether Sojka was acting as a rogue employee in making the above representations or whether he was acting with the full knowledge and approval of Wolff and Dynamic. In this vein, this court notes that, as far as it is aware, there was absolutely nothing preventing Wolff from picking up the phone and notifying plaintiff that he had secretly decided that his former sales VP would be making the product instead of him and his company. This court presumes that Wolff never did so because plaintiff's negative reaction to such a revelation would have been all-too predictable. Even (generously) assuming that Wolff was, as he claims, unaware of exactly what Sojka was up to in New York, he certainly knew that

10

he had signed a contract with plaintiff to make SmartPrime, and, that being the case, plaintiff was entitled to know of any unilateral decision he reached not to perform his duties under that contract. Of course, the law generally does not allow parties to a contract to simply decide not to perform their duties under it, and it therefore seems likely that, under those circumstances, plaintiff would have had a claim for breach of contract. It seems likely to this court that Wolff was well aware of this fact and that he therefore decided to keep his unilateral decision not to perform his duties under the contract to himself.

In light of the foregoing, this court believes that the circumstances of this case may make it very difficult for Wolff or Dynamic to wash their hands of responsibility, but it will leave it to jurors to evaluate any defenses they may see fit to offer in this regard. As far as jurisdictional issues are concerned, this court believes that the Mississippi Supreme Court would take a very dim view of defendants' alleged actions in this case and that it would almost certainly interpret this state's long-arm statute as supporting a finding that defendants allegedly committed a fraud which occurred at least in part in this state. Indeed, even assuming for the sake of argument that basing a finding of personal jurisdiction upon an allegedly fraudulent email (and other similar communications) sent to a Mississippi company represents a liberal interpretation of the state's long-arm statute, this court fully expects that the Mississippi Supreme Court would be inclined to reach such a liberal interpretation under the facts of this case.

In the court's view, there are multiple elements of the fraud cause of action which, accepting plaintiff's allegations as true, arose in Mississippi. Under Mississippi law, fraudulent misrepresentation consists of the following nine elements: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the

hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury." *Franklin* v. Lovitt Equip. Co., 420 So.2d 1370, 1373 (Miss.1982). In the court's view, the emailed representation from Sojka that Dynamic would take responsibility for manufacturing its product occurred partly in Mississippi, when that email appeared on the computer screens of SPRP and its employees in this state. Likewise, plaintiff's reliance upon Sojka's representations (on behalf of Dynamic) occurred each time this Mississippi company decided to send rights to manufacture its product to what it reasonably believed to be Wolff and Dynamic. This likewise occurred partly in Mississippi.

Even assuming for the sake of argument that the foregoing facts are somehow insufficient to conclude that the alleged fraud occurred partly in this state, the Mississippi Supreme Court has held that for "purposes of our long-arm statute, a tort is committed in Mississippi when the injury results in this State." *Horne v. Mobile Area Water & Sewer Sys.,* 897 So. 2d 972, 977 (Miss. 2004). This court believes that, under the facts of this case, the Mississippi Supreme Court would be very likely to find that the injury suffered by plaintiff occurred in this state. In so stating, this court notes that allegedly deceiving a Mississippi company regarding the basic issue of *whom it is dealing with* is one of the most egregious forms of deceit imaginable, particularly when, as here, the defendant allegedly sought to assign the contract to someone who (as a former company salesman) seemingly was not qualified to perform it. Clearly, deceiving a Mississippi company into doing business with a non-existent (or inoperative) North Carolina entity, and secretly pawning the work off to a former employee, constitute actions which are likely to result in significant economic harm in Mississippi. Plaintiff alleges that it did, in fact, suffer such harm in this state, and this court therefore concludes that the facts of this case implicate the tort prong of Mississippi's long-arm statute.

12

As noted previously, a finding that this case falls within Mississippi's long-arm statute is insufficient to support personal jurisdiction, since plaintiff must also demonstrate that exercising personal jurisdiction over defendants is consistent with the due process requirements of the Fourteenth Amendment. *Tellus Operating Group, LLC v. R & D Pipe Company,* 377 F. Supp. 2d 604, 606 (S.D. Miss. 2005) (internal citation omitted). Under these due process requirements, the contacts with the forum state "must be such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). This court concludes that these due process requirements are likewise met in this case.

In the court's view, the egregious nature of the alleged fraud in this case, which included misrepresentations in an email sent to plaintiff in Mississippi, makes it very difficult for defendants to argue that it would "offend traditional notions of fair play and substantial justice" to allow plaintiff to seek recovery for that fraud in Mississippi. In so stating, this court emphasizes that this case does not involve complaints regarding the care with which Dynamic manufactured plaintiff's product in its North Carolina facility. If that were the case, then defendants might well have reasonable arguments that this cause of action arose in North Carolina and that it would be unfair to hold them accountable for it here. In reality, however, this case involves allegations that plaintiff's very decision to enter into a contractual relationship with defendants was procured by fraud of a rather egregious nature, and this court can discern no reasonable argument that it would "offend traditional notions of fair play and substantial justice" to hold them accountable for it here.

Moreover, while this court will assume for the purposes of this order that the NDA in which defendants expressly consented to litigation in Mississippi expired by its terms, that does

13

not mean that it is completely irrelevant in deciding whether it would be unfair to subject defendants to the jurisdiction of this court. In so stating, this court notes that defendants seeking dismissal for lack of personal jurisdiction generally argue that they had no reason to expect that they would be sued in the forum state. In the court's view, it is more difficult for defendants to make that argument here, since they did, in fact, agree to be sued in Mississippi in the NDA. Moreover, plaintiff appears to at least have a good faith argument that, given the nature of the alleged fraud in this case, the bait-and-switch which, he contends, took place should be regarded as a violation of the NDA's prohibition against using information regarding the business deal for any purpose "other than for evaluating this matter." *Id.* This court will, once again, assume for the purposes of this order that the NDA should not be interpreted so broadly, but it at least seems arguable that it should,[2] and the existence of that agreement strikes this court as one valid factor to consider in determining whether it would be unfair to subject defendants to the jurisdiction of this court. This court therefore concludes that it has personal jurisdiction over each of the defendants in this case and that their motions to dismiss are due to be denied.

      As a final point, this court takes note of the fact that, in their briefing, both sides raise the possibility that they will file motions seeking for this court to either abstain from hearing this action in deference to the New York state court litigation, or to enter an order staying that New York action. This court has no intention of taking either course of action. In so stating, this court notes that parallel litigation in state and federal court is a somewhat common phenomenon, and, in the overwhelming majority of cases, the law requires federal courts to simply litigate the case before them, without either abstaining from that case or seeking to enjoin the state court

---

[2] Moreover, given that so little is present in the record regarding exactly when and how Sojka and Wolff might have agreed to the alleged "bait-and-switch" in this case, it seems entirely possible that this scheme was hatched during the effective period of the NDA.

action.  Indeed, the U.S. Supreme Court has made it clear that federal courts have a "virtually unflagging obligation of … to exercise the jurisdiction given them" and that they should only abstain in deference to state law litigation in highly exceptional cases.  *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976).

Any request by plaintiff to have this court enjoin the New York litigation would be equally without merit.  "The Anti–Injunction Act generally prohibits federal courts from interfering with proceedings in state court." *Vines v. Univ. of La*., 398 F.3d 700, 704 (5th Cir. 2005) (citing 28 U.S.C.A. § 2283). The statute states, "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." § 2283. The statute is strictly construed, and only the three exceptions contained in the text are recognized.  *See Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286–87, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970).  *See also Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).  In its brief, plaintiff previews an argument that this court should enjoin the New York action since it is necessary "in aid of its jurisdiction," but this court does not believe that this is the case.  Of course, plaintiff may provide the New York state court with a copy of its order today, and that court is certainly free to stay the case before it pending the resolution of this litigation, if it deems such to be proper.  However, this court will not order the New York court to do so.  This court will, instead, simply deny the motions to dismiss pending before it and proceed to the litigation of this matter.

It is therefore ordered that defendants' motions to dismiss [13-1, 31-1, 56-1, 58-1] are denied.

This, the 13th day of November, 2024.

                                          /s/ Michael P. Mills
                                          UNITED STATES DISTRICT JUDGE
                                          NORTHERN DISTRICT OF MISSISSIPPI